UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

KARINA SIGALOVSKAYA,

                                Plaintiff,

                  v.

SPECIAL AGENT ABIGAIL BRADEN, SPECIAL
AGENT LUANN WALKER, SPECIAL AGENT
MEGAN BUCKLEY, and SPECIAL AGENT
ROBERT MANCENE,

                                Defendants.

**MEMORANDUM AND ORDER**
15-CV-34 (LDH)

---

LaSHANN DeARCY HALL, United States District Judge:

Karina Sigalovskaya ("Plaintiff") brings this action against Immigration Customs Enforcement Homeland Security Investigations Special Agents Abigail Braden, Luann Walter, Megan Buckley, and Robert Mancene ("Defendants") pursuant to *Bivens v. Six Unknown Federal Officers* alleging false arrest, malicious prosecution, and failure to intervene. Defendants move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

### BACKGROUND[1]

Defendants are special agents in the Child Exploitation Group of Homeland Security Investigations ("HSI"), which is a part of the Bureau of Immigration and Customs Enforcement ("ICE"). (Amended Complaint ("Am. Compl.") ¶ 7, ECF No. 16.) On February 11, 2013, Defendants Walter, Buckley, and Mancene went to Plaintiff's residence, pounded on the door, yelled that they were police, and, after Plaintiff answered, forced their way past her without

---

[1] The following facts taken from the amended complaint (ECF No. 16) are assumed to be true for the purpose of this memorandum and order.

obtaining her consent to enter. (*Id.* ¶¶ 10–12.) Defendants Walter, Buckley, and Mancene were at Plaintiff's residence to execute an arrest warrant for Plaintiff's husband, Evidal Ifraimov, following an eight-month investigation into child pornography possession. (*Id.* ¶¶ 15, 19.) After Plaintiff informed Defendants Walter, Buckley, and Mancene that her husband was not home, Defendants searched her apartment. (*Id.* ¶ 24.)

While the agents were searching Plaintiff's home, Ifraimov called Plaintiff over the phone and advised her and Defendants that he would be home in 20 minutes. (*Id.* ¶ 27.) Ifraimov's attorney called Plaintiff soon after and directed her to tell Defendants to leave her home, which she did, but Defendants refused to leave. (*Id.* ¶¶ 28–29.) Instead, after conferring in a separate room with the other Defendants, Defendant Braden returned and demanded that Plaintiff write a witness statement.[2] (*Id.* ¶¶ 30–31.) After Plaintiff asked for an explanation, Defendants Walter, Buckley, and Mancene began to accuse Plaintiff of helping her husband sexually assault a minor child, which Plaintiff denied. (*Id.* ¶¶ 32–34.) Defendant Braden claimed she had proof of Plaintiff's husband's unlawful activities, and when Plaintiff asked for proof, Defendant Braden showed Plaintiff two redacted, non-pornographic photographs on a cell phone which depicted Plaintiff's young daughter from the waist up with a long sleeve shirt on. (*Id.* ¶¶ 36–39.) When asked whether Plaintiff recognized the girl in the photographs, Plaintiff responded that she recognized the girl as her daughter. (*Id.* ¶¶ 41–42.) Defendant Braden asked Plaintiff whether she recognized where the photograph was taken and if she took the photograph, and Plaintiff responded that the photograph appeared to have been taken in her home and that she had not taken the photograph. (*Id.* ¶¶ 43–46.)

---

[2] The Amended Complaint does not specify the time at which Defendant Braden arrived at Plaintiff's residence.

Notwithstanding Plaintiff's denial, Defendant Braden asserted that Plaintiff confessed that she had taken a pornographic photograph of her daughter and that Plaintiff claimed her young son had participated in taking the photograph. (*Id.* ¶¶ 47–48.) Plaintiff alleges that Defendants made additional false statements about the facts and circumstances surrounding the incriminating statements and her inculpatory actions on the night in question. (*Id.* ¶ 50.) Defendants Walter, Buckley, and Mancene forwarded the statements to the United States Attorney's Office for the Eastern District of New York, resulting in her arrest on charges of sexual exploitation of children and activities relating to material involving the sexual exploitation of minors. (*Id.* ¶¶ 52, 55.) Upon her arrest, Plaintiff was taken to a federal detention facility in New York County, forced to give DNA samples to law enforcement officials, and arraigned before Magistrate Judge Cheryl Pollak. (*Id.* ¶¶ 66–67.) Plaintiff was denied bail and held at the Metropolitan Detention Center for three weeks, during which time she was subjected to full-body strip searches, propositioned by female inmates, exposed to communicable diseases, and denied access to proper medical care and treatment. (*Id.* ¶¶ 68–73.) As a result of her incarceration, Plaintiff was unable to be with her daughter on her sixth birthday, and she missed her son's first acting audition. (*Id.* ¶¶ 74–75.)

On March 5, 2013, the charges against Plaintiff were dismissed by motion of the United States Attorney's Office. (*Id.* ¶ 76.) Still, Plaintiff was unable to see or speak to her children for three months because: "[d]ue to the unlawful and perjurious conduct of [Defendant] Braden, the New York State Administration for Children Services ("ACS") filed a petition claiming [Plaintiff] was unfit as a mother and to permanently revoke her guardianship over her children." (*Id.* ¶¶ 78–79.) Plaintiff was forced to retain an attorney and make appearances in New York's family court to regain custody of her children. (*Id.* ¶¶ 80–83.) Although Plaintiff has regained

3

custody of her children, she was required to have ACS visits twice per month for an unspecified amount of time. (*Id.* ¶ 84.) And, Plaintiff was placed on the New York State Sex Offender Registry. (*Id.* ¶ 85.)

## STANDARD OF REVIEW

A motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is reviewed under the same standard as a motion to dismiss under Rule 12(b)(6). *See Bank of New York v. First Millennium*, 607 F.3d 905, 922 (2d Cir. 2010) (citing *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994)) ("The same standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to Fed. R. Civ. P. 12(c) motions for judgment on the pleadings."). As such, to survive a motion for judgment on the pleadings, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). As with a motion to dismiss under Rule 12(b)(6), a motion for judgment on the pleadings pursuant to Rule 12(c) "must be decided solely on the pleadings before the court, in addition to any materials implicitly or explicitly incorporated by reference into those pleadings." *U.S. v. Certain Real Property and Premises Known as 44 Autumn Ave., Brooklyn, N.Y.*, 156 F.R.D. 26, 30 (E.D.N.Y. 1994).

## DISCUSSION

Defendants argue that they are entitled to judgment on the pleadings as to Plaintiff's *Bivens* claims based principally on the Supreme Court's recent decision in *Egbert v. Boule*, 142

4

S. Ct. 1793 (2022).³ Specifically, they argue that Plaintiff's claims present a new *Bivens* context and that special factors foreclose a *Bivens* remedy. The Court agrees.

In 1971, the Supreme Court held that "even absent statutory authorization, it would enforce a damages remedy to compensate persons injured by federal officers who violated the prohibition against unreasonable search and seizures." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854 (2017) (citing *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 397 (1971)). The Court extended this "implied cause of action" to two other contexts in the decade the followed. *See Davis v. Passman*, 442 U.S. 228, 248–49 (1979) (recognizing Fifth Amendment Due Process Clause cause of action for gender discrimination against congressman); *Carlson v. Green*, 446 U.S. 14, 19 (1980) (recognizing Eighth Amendment Cruel and Unusual Punishments Clause cause of action for failure to provide adequate medical treatment).

Since 1980, however, the Supreme Court has not extended *Bivens* to any new context and has expressed skepticism about *Bivens*' continued viability. Indeed, in *Boule*, the Supreme Court concluded that the judiciary's authority to create implied causes of action under the Constitution "is, at best, uncertain," and the Supreme Court has "indicated that if [it] were called to decide *Bivens* today, [it] would decline to discover any implied causes of action in the Constitution."

---

³ On March 23, 2018, Defendants moved for summary judgment, which the Court granted in part. In their summary judgment motion, Defendants did not argue that Plaintiff's false arrest and malicious prosecution claims presented a new *Bivens* context, and the Court noted that they could not. Defendants argue, and the Court agrees, that the Supreme Court's recent decision in *Egbert v.Boule*, 142 S. Ct. 1793 (2022) necessitates a special-factors analysis. Plaintiff argues that Defendants "greatly exaggerate the impact" of *Boule* and "the Supreme Court's rationale in [*Boule*] for declining to extend *Bivens* simply does not exist in this case." (Pl.'s Opp'n at 4, 6, ECF No. 16.) But, her arguments fail to account for the fact that, as Justice Sotomayor put it in her dissenting opinion, "a restless and newly constituted Court sees fit to refashion the standard anew to foreclose remedies in yet more cases." *Boule*, 142 S. Ct. at 1818 (Sotomayor, J. Dissenting). Indeed, the Supreme Court "effectively replace[d]" the two-step inquiry established in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), "with a new single-step inquiry designed to constrict *Bivens*." *Boule*, 142 S. Ct. at 1818. Moreover, it agreed that a new context was presented simply by virtue of the defendants not being Federal Bureau of Narcotics agents as they were in *Bivens*. *See id.* at 1803. In light of these circumstances, therefore, the Court must consider "whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.*

142 S. Ct. at 1803, 1809.  This Supreme Court's "about face" on *Bivens* is the result of its change in approach to implied causes of action more broadly since *Bivens* and its progeny were decided. Previously, "the Court assumed it to be a proper judicial function to 'provide such remedies as are necessary to make effective' a statute's purpose." *Abbasi*, 137 S. Ct. at 1855 (quoting *J.I Case Co. v. Borak*, 377 U.S. 426, 433 (1964)).  That is, it "assumed common-law powers to create causes of action." *Boule*, 142 S. Ct. at 1802 (quoting *Correctional Servs. Corp. v. Malesko* 534 U.S. 61, 75 (2001) (Scalia, J., concurring)).  That is no longer the case.  Instead, "the Court [has] adopted a far more cautious course before finding implied causes of action," *Abbasi*, 137 S. Ct. at 1855, because as the Supreme Court explains, it has "come 'to appreciate more fully the tension between' judicially created causes of action and 'the Constitution's separation of legislative and judicial power,'" *Boule*, 142 S. Ct. at 1802 (quoting *Hernandez v. Mesa*, 140 S. Ct. 735, 741(2020)).  Moreover, according to the Supreme Court "there are a number of economic and governmental concerns to consider," when creating a cause of action, *id.*, and "Congress is 'far more competent than the Judiciary' to weigh such policy considerations." *Boule*, 142 S. Ct. at 1803.  Today, therefore, "[w]hen asked to imply a *Bivens* action, '[the Supreme Court's] watchword is caution.'" *Id*. (quoting *Hernandez*, 140 S. Ct. at 742).

How to apply that caution though is not altogether clear.  In *Abassi*, the Supreme Court instructed lower courts to apply a two-step framework to determine the availability of a *Bivens* remedy.  *See generally* 137 S. Ct. at 1859–60.  However, only Five years later, in *Boule*, the Supreme Court "rewr[ote]" the framework, and seemingly "closing the door . . . to [claims] that fall squarely within *Bivens*' ambit." 142 S. Ct. at 1811 (Sotomayor, J. Dissenting).

6

### A. The *Abassi* Framework

In *Abassi*, the Supreme Court instructed lower courts to review *Bivens* claims in two-steps. At the first step, courts were to ask, "whether the case presents 'a new *Bivens* context'—*i.e.*, is it 'meaningful[ly]' different from the three cases in which the [Supreme Court] has implied a damages action.'" *Boule*, 142 S. Ct. at 1803 (citing *Abassi*, 137 S. Ct. at 1859–60). To make that determination courts were to consider a number of factors, including "the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider." *Abassi*, 137 S. Ct. at 1860. If the case presents a new *Bivens* context, then courts were to proceed to the second step and consider whether special factors counsel hesitation in recognizing a *Bivens* remedy. *Id*. at 1859.

The *Abassi* analysis is illustrated in *Hernandez v. Mesa,* 140 S. Ct. 735 (2020). There, the Supreme Court considered the availability of a *Bivens* remedy for a foreign plaintiff whose child had been shot and killed by a Customs and Border Patrol officer across the United States-Mexico border. *See* 140 S. Ct. at 740. The Supreme Court determined that the case presented a different context from *Bivens* and *Davis*, the two most closely analogous cases, because while "*Bivens* concerned an allegedly unconstitutional arrest and search carried out in New York City" and "*Davis* concerned alleged sex discrimination on Capitol Hill . . . . petitioners' cross-border shooting claims" presented "the risk of disruptive intrusion by the Judiciary in the functioning of other branches." *Id.* at 744. That is, the case presented a new context despite the fact that a

7

federal agent "acted in disregard of instructions governing his conduct and of Hernandez's constitutional rights[]" and used "lethal force against a person who pose[d] no immediate threat to the officer and no threat to others[, which] surely qualifie[d] as an unreasonable seizure." *Id.* at 756 (Ginsburg, J., Dissenting). At the second step, the Court found "multiple, related factors that raise[d] warning flags," including "the potential effect on foreign relations." *Id*. at 744. Specifically, the Supreme Court determined that it must "be especially wary before allowing a *Bivens* remedy that impinges on" foreign policy concerns because "matters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" *Id.* (quoting *Haig v Agee*, 453 U.S. 280, 292 (1981)). The political branches took "the position that [the] incident should be handled in a particular way" and judicial intervention "would risk the embarrassment of our government abroad through multifarious pronouncements by various departments on one question." *Id*. The Court also found significant the ramifications a *Bivens* remedy would have for national security. *See Id.* at 747 ("Since regulating the conduct of agents at the border unquestionably has national security implications, the risk of undermining border security provides reason to hesitate before extending *Bivens* into this field."). And, the Court found significant the fact that "Congress has repeatedly declined to authorize the award of damages for injury inflicted outside our borders." *Id*. Thus, *Bivens* was not extended.

### B. The Two-Step Framework After *Boule*

In 2022, the Supreme Court decided *Boule,* and in doing so, appears to have constricted the *Abassi* framework. For example, in discussing the framework, the majority noted that, in fact, the two-steps articulated under *Abassi* "often resolve to a single question: Whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id*. at

8

1803. (Of course, as Justice Gorsuch noted "[i]f the only question is whether a court is 'better equipped' than Congress to weigh the value of a new cause of action, surely the right answer will always be no." *Id.* at 1810 (Gorsuch, J. Concurring)). Additionally, the Supreme Court appears to have held, at least in effect, that any difference between the category of defendants in *Bivens* and the case before the court, regardless of how trivial, presents a new context. *Id.* at 1804. That is, the Supreme Court agreed with the Court of Appeals finding that Boule's claim presented a new context because "Agent Egbert is an agent of border patrol rather than of the F.B.I." *Boule v. Egbert*, 998 F.3d 370, 387 (9th Cir. 2021). Notably, the "new category of defendants" principle had never been relied upon "to draw artificial distinctions between line-level officers of the 83 different federal law enforcement agencies with authority to make arrests and provide police protection." *Id.* at 1815 (Sotomayor, J. Concurring in part and Dissenting in part). Finally, the Supreme Court also restricted the judiciary's review of alternative remedial structures, holding that the presence of such a structure "alone . . . is reason enough to limit the power of the judiciary to infer a new *Bivens* cause of action." *Id.* at 1804 (quoting *Abassi*, 137 S. Ct. at 1858) ("the relevant question is not whether a *Bivens* action would disrupt a remedial scheme, or whether the court should provide for a wrong that would otherwise go unredressed. . . . [r]ather, the court must ask only whether it, rather than the political branches, is better equipped to decide whether existing remedies should be augmented by the creation of a new judicial remedy.")

    C. **Plaintiff's *Bivens* Claims**

Plaintiff's claims against Defendants, which include false arrest, malicious prosecution, and failure to intervene stemming from alleged fabrication of evidence, each present a new context. At the outset, Plaintiff's malicious prosecution and failure to intervene claims are new

9

contexts because *Bivens* did not involve a malicious prosecution or failure to intervene claim. *See Annappareddy v. Pascale,* 996 F.3d 120, 134 (4th Cir. 2021) (malicious prosecution is a new *Bivens* context); *Powell v. United States*, No. 19-cv-11351, 2020 WL 5126392, at *7 (S.D.N.Y. Aug. 31, 2020) (same)*; Castang v. Geimano*, 19-cv-7178, 2020 WL 5531553, at *4 (E.D.N.Y. Sept. 14, 2020) (failure to intervene is a new *Bivens* context); *Martinez v. D'Agata*, No. 16-cv-44, 2019 WL 6895436, at *7 (S.D.N.Y. Dec. 18, 2019) (same).

While Plaintiff's false arrest claim has parallels to *Bivens*, it too presents a new context. *First*, the claim involves a new category of defendants because they are not agents of the Federal Bureau of Narcotics, but instead are HSI special agents. *Boule*, 998 F.3d at 387 ("We agree that it is an extension, in that Agent Egbert is an agent of the border patrol rather than of the F.B.I."), *affirmed*, 142 S. Ct. 1803 (2022). *Second*, as Defendants note (Mem. L. Supp. Defs'. Mot. J. on the Pleadings ("Defs'. Mem."), at 10–11, ECF No. 85-1), the focus of Plaintiff's complaint is the fabrication of evidence that led to her arrest and prolonged detention, not an illegal entry into her home during which agents searched "from stem to stern" after she had been "manacled." *Bivens,* 403 U.S. at 389. Indeed, the Amended Complaint establishes that Defendants were present at her home to arrest her husband after an eight-month investigation into his possession and production of child pornography.[4] Courts have recognized that claims involving the fabrication of evidence present a new *Bivens* context. *See Zhang v. Schuster*, No. 18-cv-3283, 2022 WL 615015, at *10 (N.D. Ill. 2022) (plaintiff's false arrest claim presented new context because "[a] false statement is different than a physical invasion of someone's home, which is what took place in *Bivens*"); *see also Ahmed v. Weyker*, 984 F.3d 564, 568 (8th Cir. 2020); *Farah v. Weyker*, 926

---

[4] To be sure, the amended complaint contains allegations concerning the Defendants search of her home, but she does not bring a cause of action based upon those facts. That is, Plaintiff does not challenge the legality of Defendants' presence in her home or of their search.

10

F.3d 492, 499 (8th Cir. 2019); *Cantu v. Moody*, 933 F.3d 414, 422 (5th Cir. 2019). Thus, Plaintiff seeks to extend *Bivens* to a new category of defendants and to a new type of misconduct.

Resisting this conclusion, Plaintiff argues that her false arrest claim does not present a new context because it is "immaterial" that Defendants were not narcotics agents. (Pl.'s Opp'n at 7–8.) Critically, however, the cases on which Plaintiff relies[5] were decided before *Boule*. 142 S. Ct. at 1803. To be sure, the Court acknowledges that the agents in *Bivens* and Defendants are similar in that they are both enforcing traditional criminal law. Still, the difference in agency is now sufficient, after *Boule*, to create a new context. *Cf id.* at 1814–15 ("The only arguably salient difference in 'context' between this case and *Bivens* is that the defendants in *Bivens* were employed at the time by the (now-defunct) Federal Bureau of Narcotics, while [Defendants were] employed by [Customs and Border Protection].") (Sotomayor, J. dissenting). Notably, Plaintiff does not meaningfully engage with *Boule* or provide the Court with any alternative interpretation of that opinion. While Plaintiff points out that *Boule* was principally concerned with national security, she ignores that national security was not cited by the Ninth Circuit or the Supreme Court as presenting a new context, but instead as a special factor counseling hesitation in extending *Bivens*. (Pl.'s Opp'n at 1, 4–5.) Moreover, even if the Court agreed that the Defendants were not a new category of Defendants, Plaintiff has provided no response to Defendants' argument that the focus of her claims is the fabrication of evidence, not invasion of her home or excessive force.

---

[5] *See* (Pl.'s Opp'n at 7–8 (citing *Powell v. United States*, No. 19-cv-11351, 2020 WL 5126392 (S.D.N.Y. Aug. 31, 2020); *Hicks v. Ferreyra*, 965 F.3d 302, 311 (4th Cir. 2020); *Jacobs v. Alam*, 915 F.3d 1028, 1038 (6th Cir. 2019); *Joane v. Hodges*, 939 F.3d 945, 952 (9th Cir. 2018).) While Plaintiff also cites another memorandum and order in *Powell v. United States* which was decided after *Boule*. But the court did not cite to or otherwise contend with *Boule* at all, and therefore it is of little assistance in this analysis.

11

Next, Plaintiff argues that her malicious prosecution claim does not present a new context because such claims have "been long recognized by courts." (Pl.'s Opp'n at 8–9.) But, the inquiry is whether the Supreme Court has recognized a malicious prosecution claim (not other lower courts). The Supreme Court certainly has not. And, as with her false arrest argument, Plaintiff relies on cases that predate *Boule,* and even *Abassi*.[6] Indeed, she completely ignores the Government's authority, and even her own[7], establishing that malicious prosecution claims present a new context. *See, e.g., Powell*, 2020 WL 5126392, at *7. In short, Plaintiff's claims[8] stemming from HSI special agents' alleged fabrication of evidence present a new *Bivens* context. Therefore, the Court must consider whether there are special factors "indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed." *Boule*, 142 S. Ct. at 1803 (internal quotation marks omitted).

Defendants argue that DHS regulations provide alternative remedies that foreclose Plaintiff's *Bivens* claims. (Defs.' Mem. at 12–15.) The Court agrees. Defendants argue that 8 C.F.R. § 287.10 is applicable to HSI agents like themselves, and requires investigation of "alleged violations of the standards for enforcement activities" and accept grievances from "any persons wishing to lodge a complaint." (*Id.* at 13.) Critically, this same regulation independently foreclosed a *Bivens* remedy in *Boule. See* 142 S. Ct. at 1806. Plaintiff argues that the regulation is inapplicable to Defendants because the regulations apply only to immigration agents. However, Defendants have provided a declaration establishing that such regulation is

---

[6] *See* Pl.'s Opp'n at 8 (citing *Barone v. United States*, (S.D.N.Y. Aug. 21, 2014); *Williams v. Young*, 769 F. Supp. 2d 594, 603 (S.D.N.Y. 2011).

[7] Plaintiff cites *Powell*, 2020 WL 5126392 at *7, which held that a claim for malicious prosecution arose in a new context. (Pl.'s Opp'n at 8–9.)

[8] Plaintiff did not defend her failure to intervene claim in her opposition.

12

applicable to HSI special agents as well as border patrol. (Pl.'s Opp'n at 11.) Completely ignoring *Boule*, Plaintiff argues further that the regulation is insufficient because it does "not offer any redress to recoup damages," "provide complainants any right to participate in the investigation process[,] or to obtain judicial review." (Pl.'s Opp'n at 11–12.) But, the Supreme Court has "never held that a *Bivens* alternative must afford rights to participation or appeal." *Boule*, 142 S. Ct. at 1806. "So long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy." *Id*. at 1807.

Even setting aside the grievance procedure, Defendants highlight other remedial structures created by Congress sufficient to give the Court pause before extending *Bivens*. Defendants assert that "Congress has authorized Inspectors General across the Executive Branch to investigate and report abuses by federal law-enforcement officers, including HSI officials." (Defs.' Mem. at 13 (citing 5 U.S.C. app. 3 § 3; 6 U.S.C. § 113(b); *Abbasi*, 137 S. Ct. at 1862).) They also assert that the Homeland Security Act of 2002 established DHS's Office of Civil Rights and Civil Liberties ("CRCL"), *see* 6 U.S.C. §§ 113(d)(3), 345, instructing the Office of the Inspector General ("OIG") to refer to it any "civil liberties matters" that OIG does not investigate, *see* 5 U.S.C. app. 3 § 8I(f)(2)(G). (Defs.' Mem. at 13–15.) CRCL is authorized to "initiate investigations of alleged abuses of civil rights and civil liberties by employees or officials of the Department." 5 U.S.C. app. 3 § 8I(f)(2)(C). Defendants identify yet another office, the Office of Professional Responsibility ("OPR"), to which constitutional rights violations may be reported. *See* 6 U.S.C. §§ 253–54. Plaintiff does not dispute the existence of these offices and procedures or that they are "safeguards to prevent constitutional violations from recurring." *Boule*, 142 S. Ct. at 1806 (internal quotation marks and alteration omitted). Indeed,

Plaintiff is silent on these points. The Court "has no warrant to doubt" that consideration of Plaintiff's complaint by any of these offices would secure adequate deterrence and afford an alternative remedy. *See id*. at 1807; *see also Lovell v. Parker*, 618 F. Supp. 3d 127, 2022 WL 3045039, at *9 (E.D.N.Y. Aug 3, 2022) (finding DHS and OIG grievances processes to be alternative remedies foreclosing a *Bivens* remedy).

Another related factor is Congress's failure to provide a *Bivens*-style remedy for this type of misconduct. Congress has created statutory mechanisms that permit "courts to award attorney fees to criminal defendants who prevail against 'vexatious, frivolous, or bad faith' positions taken by the government,'" and that permit "those wrongfully convicted and sentenced to sue the government for damages. *Selvam v. United States*, 570 F. Supp. 3d 29, 45–46 (E.D.N.Y. 2021) (quoting *Farah*, 926 F.3d at 501). But, Congress has not created a cause of action for an arrest and prosecution based upon false evidence when a conviction did not result. *Id.* Congressional inaction here counsels against extending *Bivens*, particularly in light of the other remedies available to Plaintiff that are outlined above.

Finally, the Court is unable to "predict the systemwide consequences of recognizing a cause of action under *Bivens*" for a false arrest and malicious prosecution claim premised on fabrication of evidence by HSI special agents. *Boule*, 142 S. Ct. at 1803 (internal quotation marks omitted). HSI "is the principal investigative component of DHS" and "[i]t investigates, disrupts, and dismantles transnational criminal organizations and terrorist networks that threaten or seek to exploit the customs and immigration laws of the United States." (Defs.' Mem. at 10 n.4.) Although Defendants appear to have been investigating traditional criminal law domestically, the Court cannot "appl[y] the special factors analysis at such a narrow level of generality." *Boule*, 142 S. Ct. at 1805 (internal quotation marks and citation omitted). In

14

considering "more broadly if there is any reason to think that judicial intrusion into" investigation of transnational crime and violation of customs and immigration laws "might be harmful or inappropriate," the Court has reason to pause. *Id.* (internal quotation marks omitted). Constitutional claims based on fabrication of evidence are easy to allege, and HSI has over 6,800 special agents operating in more than 210 U.S. cities and 52 countries. (Defs.' Mem. at 25.) The Court simply is not positioned to weigh the costs and benefits of permitting false arrest and malicious prosecution claims against HSI special agents based upon alleged fabrication of evidence, given that their investigations touch on national security concerns. *See Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988) (courts must be "reluctant to intrude upon the authority of the Executive"). While Plaintiff argues that the Judiciary "must hold federal officers who violate the constitution accountable" (Pl.'s Opp'n at 14), that simply is not the question the Court is to ask. Instead, the question here is "whether there is *any* rational reason (even one) to think that *Congress* is better suited to weigh the costs and benefits of allowing a damages action to proceed." *Boule*, 142 S. Ct. at 1805 (emphasis in original) (internal quotation marks omitted). And, the answer is yes, Congress is better suited to weigh the costs and benefits of allowing causes of action against HSI agents. Thus, Plaintiff's argument that "the Court" would "cause society to lose faith that the government plays fair" if it "were to permit federal officers to fabricate evidence without repercussion" is misdirected. (Pl.'s Opp'n at 14.) It is Congress, not the Judiciary, who bears this responsibility.

## CONCLUSION[9]

For the foregoing reasons, Defendant's motion for judgment on the pleadings is GRANTED.

                                                  SO ORDERED.

Dated: Brooklyn, New York                        /s/ LDH
       September 30, 2023                         LaSHANN DeARCY HALL
                                                  United States District Judge

---

[9] Defendants argue that the Federal Tort Claims Act and other equitable remedies also counsel against extending *Bivens*, but the Court need not reach that question because the two factors it has identified are sufficient after *Boule*. (Defs.' Mem. at 15–22.)